## The Commonwealth *ex rel. versus* The Pennsylvania Railroad Company.

1. A contract between the Commonwealth and a private person is ordinarily to be construed in the same manner as a like contract between natural persons, notwithstanding the remedy for its breach is not the same.

2. The Act of May 5th 1841, authorizing the lease of the surplus water of the canals, shows an intent to retain to the Commonwealth absolute control of the canals and an unfettered right to deal with them at pleasure; and the lessees could claim no more for the loss of the water than suspension of the rent.

3. The Act of May 16th 1857, for the sale of the public works, imposed on the purchasers no other duties to the lessees than those resting upon the Commonwealth at the time of the sale, and therefore, if the purchasers deemed it expedient to abandon the canal, there was no obligation on them to maintain any part of it in order to supply a lessee with water.

THIS was an application for a *mandamus* to the Supreme Court by George W. Cass, Washington McClintock, William Rogers and William E. Foale.

The petition set forth that on the 18th of November 1843, the Commonwealth granted to one Speer, his heirs, executors, administrators and assigns, for fifty years, at a yearly rent of $251, the exclusive use of the surplus water from dam No. 2, Kiskiminetas line of canal; that Speer's title has vested in Cass & McClintock; that since the grant, Speer and his successors have erected contiguous to dam No. 2 a rolling-mill, &c., with appurtenances, and have used the water for driving the mill, &c., and have regularly paid the rent; that Cass & McClintock have leased the mill, &c., and appurtenances, "including the said surplus water," to McClintock, Rogers & Foale, composing the firm of McClintock, Rogers & Co., for $2000 per annum, and the lessees are still in possession; that in pursuance of the Act of May 16th 1857, to sell the public works, the Kiskiminetas line *inter alia* was conveyed to the Pennsylvania Railroad Company, subject to all contracts and arrangements made by Act of Assembly or otherwise, for the use of the said works, and subject to the duty of said company, to carry out the same as the Commonwealth was required to do; that dam No. 2 has been long out of repair, so that the petitioners are in danger of being deprived of the surplus water and their works suspended; that the petitioners have often requested the company to put the dam in repair, but they have refused; and prayed that a *mandamus* might issue to the company to put the dam in sufficient repair, &c.

The respondents answered, admitting the introductory allegations, and averring that the contract was made under the Act of May 5th 1841, § 8 *et seq.*; the meaning of which act and contract is, that the Commonwealth reserved the right to withdraw the water without other compensation to lessee than the suspension

[Commonwealth *v.* Pennsylvania Railroad Co.]

of the rent, whenever, in the judgment of her officers, her interests would be subserved by so doing; that the act for the sale of the public works requires the railroad company to keep open the western division of the canal, embracing the Kiskiminetas line only, until the North-Western Railroad shall be open, and if the purchasers shall abandon any part of the western division, they shall lease the same to any party who may wish to keep it open, the purchasers and their assigns being for ever exempt from liability for keeping the western division in navigable condition; that the North-Western Railroad is open; that respondent, since said railroad was opened, decided to abandon the western division of the canal, and has been and is ready to lease the same to any one who will keep it open, except so far as their obligation to lease may be changed by the Act of April 27th 1864, relating to the Western Pennsylvania Railroad; that since said abandonment the respondent is for ever exempt from any liability for keeping the western division in a navigable condition. The respondent denies that the dam is out of repair, or that the relators are in danger of being deprived of the surplus water and of having their works suspended, and avers that the dam has been kept in repair; that the lessees have been permitted to have the exclusive use of the surplus water in accordance with the contract.

The respondent further denies that the relators have sustained or are likely to sustain any injury from the matters alleged by them, and avers that the relators have and have sought another and adequate remedy by suits for damages in the Court of Common Pleas of Armstrong county, and prays that the *mandamus* may be quashed.

To this answer the complainants demurred.

*W. H. & James A. Lowrie,* for relators.—The railroad company, as a private corporation, had not the irresponsible discretion and immunity from coercion which belong to state sovereignty: Penna. Railroad Co. *v.* Duquesne Borough, 10 Wright 223. *Mandamus* is the proper remedy, because there is no other legal remedy to compel the performance of the duty. The remedy for damages would be inadequate, because, in this case, there could be no certain measure. This is the remedy to compel a railroad, canal or turnpike company to perform their duties: Tapping on Mandamus 11, 121, 243, 244. When a statute imposes an obligation to perform a duty and provides no specific remedy, a *mandamus ex debito justitiæ* will be granted: Tapping 30.

*John Scott* and *Hampton & Moreland,* for defendants.—The fact that the suits in Armstrong county have been deemed adequate remedies for failure to perform a duty in the past, is an

argument that they will be deemed adequate remedies for failure in the future.

The Act of 1857 imposes no new duty on the purchaser of the public works; they must stand on the contract of 1843. The legislature designed to make all rights acquired by lessees subordinate to the public interests, and the rights might be taken away without compensation. Such a provision in a lease between private parties would control the implied covenant that the lessee should enjoy during the term: Rawle on Cov. for Title 356, note 2, ed. 1852. The acts before 1841 show the intention of the legislature: Resolution March 3d 1829, Pamph. L. 34; Act of April 5th 1829, p. 286. A water-power granted was destroyed by change in canal, but no damage was to be allowed: Act April 16th 1838, Pamph. L. 637. So the Act of 1857 authorized the abandonment of canal, &c., on completion of the North-Western Railroad. But according to the pleadings there is no failure to perform, and the court will not grant a *mandamus* for an apprehended injury.

The opinion of the court was delivered, January 18th 1866, by

STRONG, J.—If the Pennsylvania Railroad Company are under obligation to maintain in good order for the benefit of the relators dam No. 2 of the Kiskiminetas line, western division of the Pennsylvania Canal, it is in consequence of their assumption when they purchased the main line of the public works. The proviso to the seventh section of the Act of Assembly that authorized the sale and the purchase, enacted that the purchasers of the said main line should take the same and its appurtenances, subject to all contracts and arrangements before made by Act of Assembly or otherwise, for and in respect to the use of such works, and should carry out the same with all persons interested therein, in the same manner as the Commonwealth or its agents were then required to do by law: Pamph. L. 1857, p. 523. It is this proviso, if anything, which creates the duty, the performance of which the relators seek to enforce by *mandamus*. By becoming the purchasers of the main line, under that Act of Assembly, the railroad company undertook to carry out all contracts or arrangements respecting the use of the works, in the same manner as the Commonwealth or her agents were then by law required to carry them out. The measure of their obligation is the duty which rested upon the Commonwealth, and the mode of performance is defined by the law. Though the means of enforcing the fulfilment of the duty against the defendants may be greater than those which can be employed against the state, the extent of the obligation is unchanged. The defendants are liable to an action at law, if they are in default—the Commonwealth was not. But the presumption always is, that the public faith protects the citizen in

1 P. F. SMITH—23

the enjoyment of any right derived from the state, as amply as her courts of law can protect against the encroachments of private individuals ; and if the Commonwealth has made a contract with a private person, that construction is ordinarily to be · given to it which is given to a similar contract made between natural persons, though the remedy for its breach may not be the same. There is nothing in the case of· Pennsylvania Railroad Co. *v.* Duquesne Borough, 10 Wright 223, at all in conflict with these principles.   There the defendants were held liable because the Commonwealth had ever acknowledged her liability, and the defendants had taken her place.   If it had appeared that the state had abandoned the canal before the necessity of rebuilding the bridge had arisen, and before the rights and duties of the state had passed to the railroad company, it would hardly have been decided that the company was bound to rebuild the bridge.   We have then only to inquire what duty the Commonwealth owed to the relators, or those under whom they claim, when the main line of the public works was sold.   To that duty and to no greater these respondents have succeeded.

By the 8th section of the Act of May 5th 1841, the canal commissioners, or such other persons as the governor might appoint from time to time, were empowered to sell or lease, on certain conditions, the surplus water owned by the Commonwealth, and not required for the purpose of navigation, on the several lines of the Pennsylvania Canal and slackwater.   The conditions prescribed show a plain intent to authorize no demise or sale that could interfere in the least degree with the paramount object of the Commonwealth often declared before, which was the construction and maintenance of artificial means of transportation from one part of the state to another.   They show also a purpose to retain at all times absolute control of the canals, and an unfettered right to deal with them at pleasure.   Hence, it was enacted that the water might be drawn off at any time by the agents of the Commonwealth, for repairs and other necessary purposes ; that a right to resume all, or a portion, of the water demised or disposed of, when necessary for the purpose of navigation on the improvements, should be reserved, without any compensation to lessees, except reduction of the rent ; and that no sale or demise of water privileges should be so construed as to obstruct, or in any manner interrupt the navigation on any of the canals or slackwater.   The private rights intended to be assured were to be entirely subordinate to the public interests, and the lessees of surplus water could claim nothing more for loss of the water than suspension of the rent.   It was under this Act of Assembly that the demise of the surplus water of dam No. 2 on the Kiskiminetas line, was made to James R. Speer on the 18th day of November 1843.   To Speer's right the relators have succeeded.   The lease

followed the directions prescribed by the legislature. It bound the Commonwealth to no severer obligations, and it could not, had it made the attempt. The subject of the demise was surplus water, that is, water that the Commonwealth did not use for purposes of navigation. There was no covenant, express or implied, that there should be a surplus, or that the water should be useful to the lessee, or that the Commonwealth should secure to him during the term any water-power at all.

In determining the meaning of the contract, the subject of the grant is very material to be considered. It was surplus water. It would be a most unreasonable construction of a grant, to use such water out of a grantor's well as he did not use, to hold that it bound him to maintain his well ever in a condition to hold water. And in this case the lease could never have been intended to deprive the Commonwealth of the right she possessed to abandon the works she had built, and to substitute another line, or another mode of transportation. That would have been making the public interests and policy subordinate instead of superior to the contingent privilege demised to the lessee. The lease then imposed upon the Commonwealth no duty to maintain dam No. 2, on the Kiskiminetas line, during fifty years, if the ownership of the line continued so long in the Commonwealth, much less to maintain the dam after an abandonment of that line for purposes of navigation, and the substitution of another. It would have been no breach of faith in her at any time to construct her canal along another route and abandon all her works on the Kiskiminetas, making no other compensation to her lessee of surplus water than a relinquishment of the rent reserved. It was only while she chose to maintain those works, and had surplus water at dam No. 2, water which she did not use for purposes of navigation, that Speer had any right against her under the demise. Such having been her obligations, such were also the obligations assumed by the Pennsylvania Railroad Company when they became the purchasers of the main line under the Act of Assembly of May 16th 1857. The act was not a grant of any new or enlarged rights to the lessees of surplus water. Nothing in it imposed upon the purchasers any greater, or other duties to those lessees, than such as rested upon the Commonwealth at the time of the sale. The fifth section did indeed require them to purchase all boats in boating order on the western division of the canal, when they should abandon that division, should they decide to do so, thus evidencing an intention carefully to protect even imperfect rights of transporters, but no provision was introduced to compensate lessees of surplus water for such abandonment. This must have been for the obvious reason that it was not supposed they could sustain any injury from such a cause.

An examination of the provisions of the act reveals a legislative

[Commonwealth *v.* Pennsylvania Railroad Co.]

purpose to give to the purchasers privileges entirely inconsistent with a duty to maintain dams on the western division, for the accommodation of mill-owners, or for the purpose of enabling the enjoyment by lessees of surplus water. Thus in the fourth section they were empowered to alter, enlarge and deepen the canal portion of the main line, and to make such additional locks and dams as might be deemed expedient, and to make in whole or in part a slackwater navigation. The fifth section gave them authority to abandon so much of the western division as lies between Blairsville and Pittsburgh, so soon as the North-Western Railroad (now the Western Pennsylvania Railroad) should be open for business from Blairsville to the Allegheny river, with a proviso that if they should decide to abandon the western division, or any part thereof, they should be required to lease the same to any party or parties who may desire to keep it open, the expense of keeping up the same devolving upon the lessees, and the purchasers or their assigns being for ever exempt from any liability for keeping it in navigable condition. Certainly, if they were authorized to abandon that part of the western division, they could not be under obligation after abandonment to keep it up, or any part of it, either for navigation or for any other purpose, any more than the Commonwealth would have been had she abandoned it before her sale. And it must not be overlooked that these provisions are a part of the same Act of Assembly in which is contained the enactment that the purchasers of the main line should take it and its appurtenances subject to all contracts and arrangements before made by Act of Assembly, or otherwise, for and in respect to the use of the works, and should carry out the same with all persons interested, in the same manner as the Commonwealth or its agents were then required to do by law. They tend to show in what sense the legislature understood that enactment, and what was the extent of the duty imposed. The Act of Assembly must be construed so as to allow its different parts to be in harmony with each other. They cannot be harmonious, if abandonment of the western division, and every part of it from Blairsville to Pittsburgh, is inconsistent with carrying out the contracts and arrangements imposed upon the purchasers. It is plain, therefore, that these respondents are under no obligation to maintain dam No. 2 on that western division, the Western Pennsylvania Railroad having been opened for business from Blairsville to the Allegheny river, and the respondents having decided to abandon the western division of the canal.

This disposes of the case. No such duty rests upon the respondents as the relators assert. The return sets forth a full defence against a peremptory *mandamus*, and judgment on the demurrer must be given for the respondents.

Judgment for the defendants on the demurrer to the return.